[No. 24883. Department Two. March 23, 1934.]

FRANK N. HAMMERSCHMITH, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

*Harry Ellsworth Foster* and *Phil K. Eaton,* for appellant.

*The Attorney General* and *Browder Brown, Assistant,* for respondent.

[1]Reported in 30 P. (2d) 649.

GERAGHTY, J.—Frank N. Hammerschmith, while engaged in a logging operation, sustained an injury, for which he filed a claim for compensation with the department of labor and industries. After investigation by the department and an appeal to the joint board, the board rejected the claim, on the ground that claimant was not a workman, but an independent contractor. The claimant appealed to the superior court of Thurston county, where the order of the joint board was sustained. This appeal follows.

There is little dispute here on questions of fact. The issue is dependent upon the legal conclusion to be drawn from the evidence. The appellant testified before the joint board in part as follows:

"Q. When did you commence to work for Krumm Brothers and what were the terms under which you worked? A. Well, they came out and wanted to know if I would do the yarding for them for $1.75 per thousand. . . . Q. Was there any definite amount of logs that you were to yard for them? A. Well, when Mr. Krumm came out and asked me if I would do it, he told me he had between a million and a million and a half feet. . . . Q. Did you employ anyone to assist you? A. My brother and I were going down there to take the job and after we had yarded a couple of days—Mr. Krumm told me—. . . . that the logs would have to be branded down there and he would allow me an extra five cents per thousand if I would put a man there to brand the logs and to help dump them because he figured it would be as much to my advantage as it would be to his to have the logs branded and the man helped me on the dump dumping them. Q. And that was known then was it? A. Yes. Q. So that made $1.80 per thousand for yarding these logs and branding them at the dump? A. Yes. Q. And your brother and yourself and this other man were the only ones working there? A. I had one of my other brothers down there for a few days helping us and later on when we found it was impossible to yard to the

bay, that is, right down to the water as it was too muddy, then Mr. Krumm suggested that we put on a donkey and just yard to the top of the hill and the donkey would take them from the top of the hill to the bay and that would shorten my haul and naturally it would come out of my yarding. . . . Q. Now while you were on that work up until Dec. 15th, 1932, did Krumm Brothers exercise supervision over your work? A. Well, I imagine they did because they told me where to yard and what to yard and the two of them were out there and in fact another man who opened up the roads and helped us on the rigging and the like of that. Q. Were Krumm Brothers present when this work was going on? A. Yes. Q. Were they working there also? A. Yes. Q. Whose caterpillar was it that you were using? A. It belonged to L. Hammerschmith and Sons, a co-partnership and I am a partner in the co-partnership. . . . Q. Did you arrange for your brothers to come there to work? A. Yes. They are a part of the company of L. Hammerschmith and Sons.''

On cross-examination:

''Q. And what was the proposition that was advanced at that time? A. And he took me out there to see if I could yard it. Q. Yard what? A. Yard the logs. Q. How many logs? A. He had a plat with him of the ground where the logs were and he said, and I wanted to go out and see the lay of the ground and we went out and I told him I could yard it for $1.75. Q. And were you given a certain piece of timber to yard? A. Whatever he had on the ground— that was taken into consideration. Q. Then would you do all of it? A. I imagine so. Q. And you both moved your equipment down there but you would not move in there for just one or two days work? A. No. Q. But you wanted to see how much there was and the quantity of it in some measure so as to determine the price, would you not? A. Yes. . . . Q. So you sort of bid on the yarding of that entire quantity of a million or a million and a half feet? A. Well— yes. . . . Q. What hours a day did you put in

down there working? . A. Different hours. It depended on the weather. Q. You did not have regular hours of work from 8 o'clock in the morning to 5 o'clock at night? A. That's the hours we tried to put in but some mornings we would be earlier and some mornings they would be there earlier. Q. Who told you or determined what hours you would work? A. I don't know. If we could get there by 8 o'clock we would. . . . Q. That is, you and your brothers sort of put in as much time as you could according to the weather conditions, etc.? A. Yes. . . . Q. But it was your understanding that you were to continue and complete the entire job before you quit? A. That was my understanding."

J. T. Krumm, a member of Krumm Brothers, for whom appellant was doing the yarding, called as an adverse witness by appellant, testified:

". . . I told him, Mr. Hammerschmith I know nothing about this caterpillar logging but as it is coming along in the fall, I am afraid it is going to get too muddy in here but of course that is up to you and he examined the ground and did not think it would and so after looking the timber over he went back and got his car and I told him we wanted him to take the timber after it was fallen and bucked and put it in the water and I wanted the price per thousand for that and we drove back to Olympia and got back into town and he says 'I will tell you, Mr. Krumm, I will put them logs into the water for $1.75 per thousand' and I turned around and I says 'Mr. Hammerschmith you got a job' and he says 'all right' and in the course of time he came and went to work. . . . Q. Did you have any written agreement with Hammerschmith? A. No. There was supposed to have been a written agreement. I told him I wanted a written agreement and he said it did not make any difference to him whether there was or was not so it just drifted along that way. I did not have any control over Mr. Hammerschmith hiring any men. He could hire as many men as he wanted to or whoever he wanted to and he could work them as long as he wanted to or where he

wanted to and I took the stand that I certainly would not be and could not be held responsible for something I had no supervision over and I don't believe when it comes down to a case that they can hold a man responsible for something he has no jurisdiction over. He might have all kinds of men working there and he might have them working in a dangerous place and I could not tell him not to do it. It was entirely up to him how he handled the thing in every way and anything I did was merely a suggestion to hurry up the pay day if it was possible to do it. Q. But you had the right at any time to discharge him from the work? A. I believe if I had discharged him that Mr. Hammerschmith could have sued me for the contract. Q. You are not contemplating suing him for failure to complete the contract at the present time? . . . A. No sir.''

Appellant cites several cases in support of his contention that he was an employee rather than an independent contractor. The case nearest in point and most strongly urged by him as controlling here is *Burchett v. Department of Labor and Industries,* 146 Wash. 85, 261 Pac. 802, 263 Pac. 746. Upon the facts in that case, this court held the claimant to be an employee. The case was a marginal one, and it is evident upon the face of the opinion that it gave the court some difficulty and required a hearing *en banc.*

The facts established in that case were that the claimant had agreed to haul logs for one Christensen, furnishing his own truck and gas, and his own services, and to be compensated therefor at the rate of four dollars per thousand feet for all logs hauled. No definite quantity of logs was specified, claimant being free to quit at any time, and Christensen being free to discharge him at will. From the time of commencement of the work, it was continuous, claimant working until he was hurt, and hauling for no other person than

Christensen during the period. Claimant hauled only the logs that were loaded upon his truck by other employees of Christensen in the woods, and was not permitted to haul any other logs. He unloaded the logs at a place designated by Christensen. He was required to report at a certain time in the morning, when the other employees of Christensen were at hand to load the logs upon his truck, and was not permitted to carry any passengers upon his truck during the hauling, nor permitted to leave the logs on the truck over night. In the course of its opinion, the court says:

"We confess that the question here is a most difficult one. The distinction between an employee or servant and an independent contractor has been considered by the courts in numberless cases, but no statement of the rule has yet been made which perfectly fits every case.

"It will be observed that, in this case, there was no definite result to be accomplished; that is, there was no certain quantity of logs to be hauled or any certain time within which any delivery was to be made. The hiring seems to have been personal. Respondent probably had no right to employ another to take his place to do the hauling with his own truck. Even though the compensation was to be by the thousand feet rather than by the day, the manner of compensating is only one element to be considered in determining whether one is an independent contractor or an employee.

"All well reasoned authorities, including our own, are to the effect that there must be control, not only as to method but as to detail, to constitute employment. That is the effect of our decision in the *Machenheimer* case, *supra* [*Machenheimer v. Department of Labor & Industries*, 124 Wash. 259, 214 Pac. 17], where it was shown that the work was done by a partnership in repairing boilers, and that the manner of the repairing was entirely entrusted to the one sent to do the work, the employer's superintendent only designating which boiler was to be repaired first, and which next, and how many flues in each boiler were affected and needed repairing, but left the workman to do the work as he

pleased. There was no control over the method or details of the work.

"In this case, while it is by no means free from doubt, it would appear that there was sufficient control by the employer over the method and details of doing the work to constitute respondent an employee or servant."

It will be observed from the facts and excerpt from the opinion that the *Burchett* case turned upon the question of control, the court reaching the conclusion that there appeared in the case sufficient control by the employer over the method and details of doing the work to constitute the respondent an employee or servant. It is apparent in the case before us that the facts bear more decidedly toward the view that the appellant was a contractor, rather than an employee.

In the *Burchett* case, the employment was personal. As said by the court, it was probable that the claimant had no right to employ another to take his place to do the hauling with his own truck. There is nothing suggestive of a contract for hauling any definite amount of logs, nor anything implying employment for any definite time. Every detail of his duty was prescribed for him by the employer. True, he furnished his truck, but only as an implement for performing the service for which he was hired. The fact that he was to be paid by the thousand, rather than by a fixed wage, did not change his status. He was a piece worker, paid for what he did.

In the case at bar, while the contract between the parties was not reduced to writing, it was fairly definitely understood that appellant was employed to yard all of the logs on the land pointed out to him, estimated at one million to one and one-half million feet. While no time was specified, it was understood that the logs were to be yarded as rapidly as possible,

because appellant and his employer could only receive payment when the logs were delivered and sold. The job was not one that could be done by appellant alone, but required the employment of others, and in employing such necessary help he was left entirely free. He had his two brothers and two other men to assist him, and they looked to him only for their pay and direction.

Independently of the positive statement of Krumm, it may be fairly inferred from the terms of the oral contract, as testified to by the parties, that Krumm Brothers could not have discharged the appellant at will. Nor can it be said that the employment by appellant, at the suggestion of Krumm, of an additional man to brand the logs and one to operate the donkey engine indicated such control of the operation as would make appellant an employee. So, too, the building of a new road, when the old one became too soft for the caterpillar, appears from the testimony to have been mutually agreed on by appellant and his brother on the one hand and Krumm Brothers on the other.

We need not discuss the other cases cited by appellant, because none of them is as favorable to his contention as the *Burchett* case.

We are of the opinion that the trial court reached a correct conclusion on the law, and the judgment will be affirmed.

BEALS, C. J., BLAKE, STEINERT, and TOLMAN, JJ., concur.